# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America | |
| v. | Case No. 18-mj-5261 |
| TOMAS MARTINEZ-DEVEDIA | (FILED UNDER SEAL) |
| *Defendants* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or about October 2018 and on or about December 3, 2018, in the Western District of New York, the defendant, **TOMAS MARTINEZ-DEVEDIA**, did knowingly, intentionally, and unlawfully possess with intent to distribute, and distribute, 3,4-methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code Section 2.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

FRANCIS ZABAWA
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 6, 2018

_____
*Judge's signature*

HONORABLE MICHAEL J. ROEMER
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Buffalo, New York

## AFFIDAVIT

STATE OF NEW YORK    )
COUNTY OF ERIE       )   SS:
CITY OF BUFFALO      )

**FRANCIS ZABAWA**, being duly sworn, deposes and states:

1. I am a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations (HSI), assigned to the HSI Buffalo Border Enforcement Security Task Force (BEST), within the Department of Homeland Security. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516 as well as to conduct investigations and to make arrests for offenses enumerated in Title 21.

2. I have been employed as a Special Agent with HSI since July 2007. Prior to my appointment with HSI, I served as a Marine Interdiction Agent with the United States Customs and Border Protection ("CBP") from June 2004 through July 2007. During my tenure with both HSI and CBP, I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers and money launderers. Through my training, education, and experience (including debriefing cooperating drug traffickers and money launderers, monitoring wiretapped conversations of drug traffickers and money launderers, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking and money laundering), I have become familiar

with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the various ways drug money is laundered, and the efforts of persons involved in such activities to avoid detection by law enforcement. My investigative experience detailed herein, as well as the experience of other law enforcement agents who are participating in this investigation, and information provided to me by cooperating sources, serve as the basis for the opinions and conclusions set forth herein.

3.  During my law enforcement career, I have participated in numerous cases involving the distribution of narcotics. I have participated in successful investigations into illicit drug distribution networks. I am familiar with how controlled substances are obtained, diluted, packaged, distributed, sold and used within the framework of drug trafficking and how drug traffickers use their persons and personal property to facilitate their illegal activities.

4.  I am familiar with all aspects of this investigation as a result of my participation in this investigation, as well as conversations with other law enforcement officers, and review of documents and records obtained by HSI Agents, Erie County Sheriff's Office ("ECSO"), the New York State Police ("NYSP"), and other local Police Departments. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish the required foundation for the requested criminal complaint.

## Overview

5. Through reviewing recorded communications and other investigative techniques, I learned that, between June 22, 2018 and December 3, 2018, the defendant **TOMAS MARTINEZ-DEVEDIA**, individually purchased approximately $118,000 in Bitcoin on 5 occasions with an HSI undercover agent ("UCA-1"). These meetings revealed that MARTINEZ-DEVEDIA has been using bitcoins to buy 3,4-methylenedioxy-methamphetamine (MDMA) a Schedule I controlled substance and selling the MDMA in bulk.

## Background of Bitcoin

6. Based on my experience in this investigation, I know the following about Bitcoin:

a. Bitcoin is a virtual currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operation on a decentralized, "peer-to-peer"[1] network. Bitcoin transactions are recorded on the "blockchain." The blockchain is a shared public ledger on which the entire Bitcoin network relies. All confirmed transactions are included in the blockchain. This way, Bitcoin wallets can calculate their spendable balance and new transactions can be verified to be spending bitcoins that are actually owned by the spender. The integrity and the chronological order of the blockchain are enforced with cryptography.

---

[1] Peer-to-peer (P2P) is a decentralized communications model in which each party has the same capabilities and either party can initiate a communication session. Unlike the client/server model, in which the client makes a service request and the server fulfills the request, the P2P network model allows each node to function as both a client and server.

b. Bitcoin mining is the process by which transactions are verified and added to the blockchain, and also the means through which new bitcoins are released. Individuals who run the mining software, competing against each other to set up each new block in the chain, are known as "miners." Each new block currently releases 12.5 bitcoins to its miner.

c. To acquire bitcoins without mining, a user typically purchases them from a Bitcoin exchanger. Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible virtual currencies. A user will normally send or provide payment in the form of fiat or other convertible virtual currency to an exchanger, usually via wire transfer or the Automated Clearing House (an electronic network for financial transactions in the United States), for the corresponding number of bitcoins based on a floating exchange rate. The exchanger, often for a commission, will attempt to broker the purchase with another user on the exchange that is trying to sell bitcoins.

d. In order for a user to acquire bitcoins, they must be sent to the user's Bitcoin address. This address is an alphanumeric string whose use is somewhat analogous to a bank account number. The user can then conduct transactions with other Bitcoin users, by transferring bitcoins to their Bitcoin addresses, via the Internet.

e. Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction. Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reveal any identifying information.

f. Bitcoin is not inherently illegal and has known legitimate uses, much like cash; bitcoins, however, are also used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which they can be used anonymously, again like cash.

4

7. On June 20, 2018 an HSI Buffalo Undercover Agent (hereinafter UCA-1) was contacted via text message by an unknown person utilizing Rochester, NY area code phone number (585) 364-9936 requesting to purchase approximately $17,000.00 in Bitcoin and requested to not be identified thereby violating know your customer (KYC) anti-money laundering laws. KYC is a term used to describe how a business identifies and verifies the identity of a client

### June 22, 2018 Transaction

8. On June 22, 2018, UCA-1 met the user of (585) 364-9936 at a restaurant in Buffalo, NY. During the meeting, the user of the Rochester, NY area code phone number identified himself as "Mike" to UCA-1. "Mike" apologized for being late and stated that he had to stop at the ATM and he was required to call the bank for identity verification. "Mike" then told UCA-1 that he met him a year ago in Batavia, NY to exchange to $8,000.00 for Bitcoin. UCA-1 replied "yeah you do look familiar". UCA-1 and "Mike" then left the restaurant and entered UCA-1's vehicle. "Mike" then gave UCA-1 $17,800.00 USD some of which was contained inside of Citizens Bank envelope for 2.6512 Bitcoin, which UCA-1 transferred to "Mike" by scanning the Bitcoin address QR code on "Mike's" white Apple I-phone. Surveillance of "Mike" after the Bitcoin deal resulted in the documenting of the license plate of the vehicle "Mike" was operating. Database checks showed that the vehicle "Mike" was operating is registered to T MARTINEZDEVEDIA, 933 University 327, Rochester, NY 14607. A photo of Tomas MARTINEZ-DEVEDIA was shown to UCA-1 and UCA-1 confirmed that it was a photo of "Mike".

5

### July 25, 2018 Transaction

9. Between July 10, 2018, and July 25, 2018, UCA-1 and MARTINEZ-DEVEDIA negotiated the sale of approximately $20,000 USD worth of Bitcoin via text messages and agreed to meet on July 25, 2018 at the same restaurant as the first deal. When MARTINEZ-DEVEDIA arrived, he and UCA-1 left the restaurant and entered UCA-1's vehicle. MARTINEZ-DEVEDIA then gave UCA-1 $20,820 USD for 2.3615 Bitcoin, which UCA-1 transferred to MARTINEZ-DEVEDIA by scanning the Bitcoin address QR code on MARTINEZ-DEVEDIA's cell phone. MARTINEZ-DEVEDIA informed UCA-1 that he would probably need $10,000 worth of Bitcoin in the next couple of days.

### July 27, 2018 Transaction

10. Between July 25, 2018 and July 27, 2018, UCA-1 and MARTINEZ-DEVEDIA negotiated the sale of approximately $15,000 USD worth of Bitcoin via text messages. MARTINEZ-DEVEDIA agreed to meet UCA-1 on July 27, 2018 at the same restaurant as the previous deals. When MARTINEZ-DEVEDIA arrived at the restaurant, he and UCA-1 left and entered UCA-1's vehicle. MARTINEZ-DEVEDIA told UCA-1 that he spends a lot of time in Buffalo and that on the prior Wednesday when he met UCA-1 he drove home to Rochester, spent ten minutes, and then drove back to Buffalo because he had to collect money. MARTINEZ-DEVEDIA then gave UCA-1 $15,700 USD for 1.7786 Bitcoin, which UCA-1 transferred to MARTINEZ-DEVEDIA by scanning the Bitcoin address QR code on MARTINEZ-DEVEDIA's cell phone. MARTINEZ-DEVEDIA asked UCA-1 about using Wicker or Signal (encrypted messaging cell phone applications) to communicate in the future. UCA-1 mentioned that Dream Market (a darknet marketplace for buyers and sellers of narcotics and other illicit goods) charged vendors a percentage of every sale for their

virtual store, escrow services and other benefits of using the marketplace. UCA-1 continued to explain the vendor side of selling narcotics both on the market and via direct deals. MARTINEZ-DEVEDIA replied that he as a buyer of narcotics prefers to do direct deals. UCA-1 stated that he/she stayed in touch with vendors using "Jabber" (a messaging program) to which MARTINEZ-DEVEDIA replied, "That's the key, is to stay in contact with the good ones, that's why I just direct deal, like I don't really fuck with the markets at all after AlphaBay and shit. I'm just like forget it. Like, make good connections get email addresses and keep it like that you know, way smarter." UCA-1 advised MARTINEZ-DEVEDIA that he would get a new phone, so he/she could acquire the Signal application.

### October 3, 2018 Transaction

11.     Between August 11, 2016 and October 3, 2018, UCA-1 and MARTINEZ-DEVEDIA negotiated the sale of approximately $32,000 USD worth of Bitcoin via text messages and agreed to meet on October 3, 2018 at the same restaurant as the previous deals. When MARTINEZ-DEVEDIA arrived at the restaurant, he and UCA-1 left and entered UCA-1's vehicle. MARTINEZ-DEVEDIA told UCA-1 that he had to use a Bitcoin ATM a few times while UCA-1 was out of town. MARTINEZ-DEVEDIA stated that the ATM took too long because it only takes one bill at a time and he only did $5,000 or $8,000 and it took like thirty minutes. MARTINEZ-DEVEDIA then gave UCA-1 $32,020 in United States currency for 4.5819 Bitcoin, which UCA-1 transferred to MARTINEZ-DEVEDIA by scanning the Bitcoin address QR code on MARTINEZ-DEVEDIA's cell phone. UCA-1 proposed to MARTINEZ-DEVEDIA that since he/she was getting out of selling narcotics locally but was looking for more bitcoin trading partners, that if MARTINEZ-DEVEDIA could provide some individuals from Rochester that would want to buy bitcoin, UCA-1 could

7

give MARTINEZ-DEVEDIA his local narcotic purchasers and UCA-1 has a friend who is MDMA trafficker and is looking for a new source of supply. MARTINEZ-DEVEDIA stated that he would want to verify who they were. MARTINEZ-DEVEDIA asked that the new customers would contact him on the messaging application Wicker or Signal, but preferred Wicker. MARTINEZ-DEVEDIA stated that he disliked Signal because, "If your person that you're talking to is compromised they can just show the cop and then it's your phone number, unless it's not your phone number, which is good." UCA-1 and MARTINEZ-DEVEDIA again began talking about MARTINEZ-DEVEDIA selling to UCA-1's friend. MARTINEZ-DEVEDIA asked UCA-1, "Well what volume is he talking usually?" UCA-1 said that it used to be a lot, a couple keys at a time. MARTINEZ-DEVEDIA replied "Okay, perfect." UCA-1 stated, "I don't know if that's what you can do?" MARTINEZ-DEVEDIA replied, "Yeah." UCA-1 said, "If you want to do like a small thing, just to see how it goes with him." MARTINEZ-DEVEDIA replied, "Probably to start but um, but yeah I can fulfill that so just let me know." UCA-1 asked MARTINEZ-DEVEDIA how much he would want to start with because his customer would not want to do five keys the first time the met. MARTINEZ-DEVEDIA replied "Yeah for sure, um, start with like a quarter maybe, you know what I mean? I feel like that's a comfortable spot." UCA-1 asked MARTINEZ-DEVEDIA what he would charge, and MARTINEZ-DEVEDIA stated "I've been getting a thousand an ounce um, is that way too high for him you think or?" UCA-1 replied, "Probably not, I mean as long as it goes down if he's doing bulk with you." MARTINEZ-DEVEDIA stated, "For sure, for sure it goes down." UCA-1 said, "If you guys want to do like an ounce get to know ya thing, he might be cool with that price, that's probably fine." MARTINEZ-DEVEDIA stated, "For sure. Lately I've just been breaking them down and taking my time with it and getting

8

you know what I mean but." UCA-1 agreed to get Wicker or Signal and would forward the contact information to MARTINEZ-DEVEDIA.

12.     Between October 15, 2018 and October 26, 2018, UCA-1 and MARTINEZ-DEVEDIA negotiated the exchange of $31,000 USD worth of Bitcoin and the purchase of one ounce of MDMA by UCA-1's friend (hereinafter UCA-2) for $1,000 USD.

### October 26, 2018 Transaction

13.     On October 26, 2018 UCA-1 and MARTINEZ-DEVEDIA agreed to meet at the same restaurant was previous deals and exchange approximately $31,000 USD worth of Bitcoin and the purchase of one ounce of MDMA for $1,000 USD via the Signal cell phone application. MARTINEZ-DEVEDIA also informed UCA-1 that he had a pack (mail package containing narcotics) stolen and it was a significant monetary loss. When MARTINEZ-DEVEDIA arrived at the restaurant, he and UCA-1 left and entered UCA-1's vehicle. MARTINEZ-DEVEDIA told UCA-1 that he was late because he had to take an Uber from Rochester to Buffalo and the driver was lost. MARTINEZ-DEVEDIA also stated that he was pulled over the day before an issued a ticket for a suspended driver's license. MARTINEZ-DEVEDIA then stated the final trade amount was $32,000 USD "if you include the ounce." MARTINEZ-DEVEDIA told UCA-1 that he had $31,000 USD, but wanted to include the $1,000 USD that undercover agent-2 (hereinafter UCA-2) had for the trade, so MARTINEZ-DEVEDIA would give UCA-1 $32,000 USD total and wanted $32,000 USD in Bitcoin. MARTINEZ-DEVEDIA then gave UCA-1 $ 31,000 USD for 4.4596 Bitcoin (which included the $1,000 USD that UCA-2 was holding for the one ounce of MDMA for a total of $32,000 USD), which UCA-1 transferred to MARTINEZ-DEVEDIA by scanning the Bitcoin

9

address QR code on MARTINEZ-DEVEDIA's cell phone. MARTINEZ-DEVEDIA then removed from his front left pocket a bag that contained a light brown crystalline substance, also visible inside this bag were two pills that MARTINEZ-DEVEDIA described as "e pills" and gave them to UCA-1. MARTINEZ-DEVEDIA asked UCA-1 about seeing the Facebook or social media of UCA-2. UCA-1 replied that UCA-2 just like UCA-1 does not like to give out much more than a first name so that might not work. MARTINEZ-DEVEDIA stated, "I understand for sure, um I just feel like since I'm , since I'm on the supplying end of it, you know what I mean, it's like I have to take more precaution than he does." UCA-1 asked MARTINEZ-DEVEDIA about his pack that got stolen and UCA-1 stated that he/she had never had a pack stolen. MARTINEZ-DEVEDIA said "Yeah, I was just kinda scrambling for new drops so I paid this guy but, I just didn't think he would have the nerve to do that really, I didn't think he had it in him." UCA-1 asked if he knew what was in the packages and MARTINEZ-DEVEDIA said, "No, yeah I tried to keep it on the low but he must figured it was." UCA-1 stated, "Something worth stealing?" MARTINEZ-DEVEDIA said, "Yeah, at least more worth more than what I was paying him." UCA-1 said that if people didn't know what was in them, you can get away with paying them a hundred bucks and MARTINEZ-DEVEDIA said "Yeah, for sure, no, I was, I was still being pretty fair." After the meeting, MARTINEZ-DEVEDIA utilizing the Signal cell phone application told UCA-1 that he did not want his information given to UCA-2 since UCA-2 wouldn't give up his social media information. After the Bitcoin sale and MDMA purchase, MARTINEZ-DEVEDIA was observed by law enforcement being picked up at the meet location by an Uber. The Uber containing MARTINEZ-DEVEDIA as a passenger was followed by law enforcement until MARTINEZ-DEVEDIA was dropped off by the Uber at 933 University Ave. Rochester, NY

14607. MARTINEZ-DEVEDIA was observed entering through the front door of the apartment complex, which had 933 in white numbers above it.

14. The suspected 28.9 grams of MDMA field-tested positive for methamphetamine/MDMA utilizing Narco Pouch test kit #923. On October 30, 2018, the suspected MDMA was forwarded to the U.S. Customs and Border Protection's Chicago Laboratory for chemical analysis. On November 29, 2018 the Chicago Laboratory confirmed that the sample was 3,4-methylenedioxymethamphetamine (MDMA), which is a Schedule I controlled substance.

15. Between November 27, 2018 and December 3, 2018 UCA-1 and MARTINEZ-DEVEDIA negotiated the exchange of $34,000 USD worth of Bitcoin and the purchase of 500 grams of MDMA for $15,000 USD.

### December 3, 2018 Transaction

16. On December 3, 2018, MARTINEZ-DEVEDIA contacted UCA-1 via the Signal cell phone application and indicated that he was going to send his friend with $33,000 USD and 500 grams of MDMA to the agreed upon meet location. MARTINEZ-DEVEDIA indicated that his friend would be wearing a blue Brooklyn Dodgers hat, a blue hoodie, khaki pants, blue and white sneakers and a black jacket. At approximately 10:58 a.m., a Hispanic male wearing a blue Brooklyn Dodgers hat, a blue hoodie, khaki pants, blue and white sneakers and a black jacket approached the HSI undercover vehicle and entered the vehicle. This unknown male handed a black backpack to UCA-1 and stated, "Everything is right here." UCA-1 spot-checked the bag and the unknown Hispanic male said, "here take a look

at this he said" and provided a picture of the QR code. UCA-1 took a picture of the QR code and told the Hispanic male "looks like everything is here." The Hispanic male then exited the undercover vehicle. A search of the black backpack given to UCA-1 resulted in the discovery of 512 grams of a light brown chunky substance that field tested positive for methamphetamine/MDMA utilizing Narco Pouch test kit #923. Also discovered in the black backpack was $33,000 in U.S. currency. UCA-1 did not transfer any Bitcoin to MARTINEZ-DEVEDIA after receiving the narcotics and U.S. currency.

17.   Based upon the foregoing, it is respectfully submitted that there is probable cause to believe that TOMAS MARTINEZ-DEVEDIA did knowingly, intentionally, and unlawfully possess with intent to distribute, and distribute, MDMA in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2.

18.   I further request that this affidavit and criminal complaint remained sealed until MARTINEZ-DEVEDIA is arrested or the Court orders it to be unsealed, whichever occurs first

_____
FRANCIS ZABAWA
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me

this _6th_ day of December, 2018.

_____
HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

12